EDWIN F. RUSSELL, complainant,

*v.*

LUCIUS T. RUSSELL, SR., et al., defendants.

[Decided July 26th, 1940.]

*Mr. Milton M. Unger,* for the complainant.

*Mr. Lucius T. Russell, Sr., pro se.*

EGAN, V. C.

On June 20th, 1940, Vice-Chancellor Stein issued an order to show cause why a preliminary injunction should not issue against the defendants in accordance with the prayer of the complainant, with a restraint, returnable at the Chancery chambers, Newark, New Jersey, on the 2d day of July, 1940. It was represented by counsel that on the return day of the order he appeared before Vice-Chancellor Bigelow, who refused to hear the motion under the provisions of rule 297 of this court. Vice-Chancellor Stein was unavailable at the time, and consequently counsel came to this vicinage and argued the motion here.

The complaint and the affidavits appended thereto, and the answering affidavit, are voluminous. The defendants' reply to the bill and affidavits is a combination of answers and affidavit. At the argument of the motion, complainant appeared by counsel, while the defendant Lucius T. Russell, Sr., appeared *pro se,* and he also argued the cause of the other defendants.

The defendants admit and deny the material allegations of the complaint; and they make charges and counter-charges

against the complainant. They present arguments, summations and conclusions in their answers, which properly should have no place upon the hearing of a motion. The answers of Phyllis Ward and Anna C. Abbott are not sworn to. Neither of them made an affidavit. In their answer they say:

"The acts of Anna C. Abbott and Phyllis Ward during their entire association with L. T. Russell, Sr., and the Preferred Stockholders' Committee organized by George F. Corrigan, Jr., on August 20th, 1937, have been truly and fully set forth by defendant L. T. Russell, Sr., wherein he speaks within his knowledge also for Anna C. Abbott and Phyllis Ward."

There is but one question in these proceedings that this court can determine, namely, whether or not the instant case warrants the issuance of a preliminary injunction to restrain the defendants from certain acts or course of conduct which threaten a continuing injury of an irreparable nature to complainant's business and property rights.

The bill charges that the defendant Russell, Sr., caused to be instituted three suits in the United States District Court, for the District of New Jersey, which were subsequently dismissed by the court; and also that he instigated two suits in the Essex County Circuit Court, one of which resulted in a voluntary nonsuit, while the other action, instituted on or about May 5th, 1938, is at issue, and is on the list of causes awaiting trial.

The suits in the federal court were brought against the Cortland Corporation, Samuel I. Newhouse and William F. Hofmann, who are president and treasurer, respectively, of the Newark Morning Ledger Company, a corporation of New Jersey, of which company complainant is secretary. The Cortland Corporation had been organized by the said Newhouse and Russell, Sr., pursuant to an agreement made by them in April, 1935, for the purpose of acquiring outstanding preferred stock of the Newark Morning Ledger Company. One-half of the stock was owned by Mr. Newhouse and his associates, the other half was held by Mrs. Russell, which she sold to complainant in October, 1939.

The Newark Morning Ledger Company publishes the newspaper known as the *Newark Star-Ledger*. The complainant, through purchase from his mother, Marian G. Russell, holds 24,417 shares of the common stock, which is approximately forty-nine per cent. of the total issued and outstanding capital stock, while 25,500 shares of the said common stock are held by Samuel I. Newhouse and William F. Hofmann. The latter shares constitute about fifty-one per cent. of the entire stock issued. The complainant is assistant publisher of the Ledger Company, and is employed by it at a salary of $200 per week.

Two of the suits in the federal court were brought in the name of Marian G. Russell, the wife of the defendant Lucius T. Russell, Sr. One was started in August, 1937. Mrs. Russell owned one-half of the common stock in the Cortland Corporation, while the other half of the stock was owned by Newhouse and his associates. In the bill of complaint Mrs. Russell charged Newhouse, president of the Cortland Corporation, with fraud, conversion of money from that corporation, and with other misconduct. The officers and directors of the Cortland Corporation were and are the same as those of the Ledger Company. One month after the filing of the August, 1937, bill of complaint by Marian G. Russell, it is charged that Russell, Sr., also instigated the filing of the second suit by Mrs. Russell in the United States District Court against the Newark Ledger Company. In this suit she was joined by Patrick J. Delehanty, a stockholder of the Ledger Company, as co-complainant. During this period, it is alleged, Russell, Sr., was forming and conducting meetings of stockholders of preferred stock of the Ledger Company, and organizing stockholders committees. It is said that he instigated the bringing of the third suit in the United States District Court by a group of stockholders of the Ledger Company against Newhouse, Hofmann and the Ledger Company. This third suit was based substantially on the same charges of fraud and mismanagement as set forth in the bill of complaint filed by Mrs. Russell and Delehanty. This third suit was brought in the name of Edmund D. Sauer and others.

The suits were tried together in the United States District Court, for the District of New Jersey, in October, 1938. The bills were dismissed with prejudice.

On August 20th, 1937, Russell, Sr., brought suit in the Essex County Circuit Court against the Ledger Company for damages for breach of his employment contract. On or about June 19th, 1939, after plaintiff's proofs were submitted, the plaintiff asked for and obtained a voluntary nonsuit. In May, 1935, a contract of employment was entered into between the Ledger Company and the said Lucius T. Russell, Sr., by the terms of which the latter was to receive a salary of $400 per week from the Ledger Company during his lifetime and so long as he continued in control of the aforesaid forty-nine per cent. of said common capital stock.

It is alleged that the defendant Russell, Sr., caused to be printed, published and circulated to the public, under the title of *Newark Leader,* made up in tabloid form, five or six editions of the said *Newark Leader* containing charges of fraud and swindling against the said Newhouse, his lawyers, some of his employes and those associated and identified with him. Some of the publications charged Newhouse and his associates with bribery and mail frauds. The same publications charged the *Newark Morning Ledger* with having falsified circulation reports and advertising contracts, and that it had been unfair in its dealings with various unions, whose members are employes of the company, and with newsdealers who sell the papers published by the said company.

The defendants Phyllis Ward and Anna C. Abbott, it is alleged, are associated with the defendant Russell, Sr., in his conduct and attacks against the Newark Morning Ledger Company and the Cortland Company.

The defendant, Russell, Sr., it is charged, has caused the *Leader* to be mailed, or delivered in person, to a large number of individuals, among whom are advertisers of the *Ledger,* its employes and stockholders. Complainant charges that the defendant Russell, Sr., endeavored to simulate the name of "Ledger" by the use of the name "Leader," and that he tried to make the "Leader" look and appear like the "Ledger," utilizing the same type and size of printing. It is claimed

by the complainant that Russell, Sr., went to advertisers of the *Ledger* and made false charges against the said Newhouse. These acts and conduct on the part of the defendants, it is contended, have had a serious effect on the *Ledger's* business, with consequent peril to complainant's employment.

The complainant alleges that the stock held by him as aforesaid was purchased from his mother; that it was his intention to hold the stock not only for his own benefit, but also part of the money, profits, or dividends arising therefrom, for the benefit of his mother, brothers and sisters. He says that the attitude of his father, Russell, Sr., is affecting his income from the *Newark Ledger,* in consequence of which the value of his stock is impaired, and that it likewise will impair his ability to pay his mother weekly installments due her under his contract of purchase with her of the aforesaid stock.

Complainant charges that the defendants' acts constitute a violation of "the right of the complainant to contract and conduct his business; that the defendants have interfered therewith and with the performance of complainant's contract with his mother, and with his employment by unlawful means and for unlawful purposes; that a continuance of the acts of the defendants will result in the loss of complainant's employment, of the property of the Ledger Co. and of the value, benefit and return of complainant's shares of stock therein; that the acts of the defendants are causing a loss of the good will and business reputation of the Ledger Co. resulting in damage and loss to complainant by reason of his stock ownership therein, and his employment."

Complainant avers that his ownership of shares in the Ledger Company, and his contract of employment therewith are property rights belonging to him and that he is entitled to be protected from undue interference therewith by persons who are not parties thereto and who have no interest therein.

There is absolutely no question about the power of this court to protect a man in the exercise of his business, or calling, from which he derives his livelihood. Where there is a right, there is a remedy. *Barr* v. *Essex Trades Council, 53 N. J. Eq. 101; 30 Atl. Rep. 881.* It is reasonable to assume

that what has been done by the defendants has been done intentionally with a knowledge of the consequence of their acts. "Courts are bound to look at things just as they are, to pass on facts just as they are developed, to treat the conduct of men just as it is, and to impute to them that intention which their acts and their conduct disclose was their intention." *United States* v. *Kane, 23 Fed. Rep. 750.*

In *Barr* v. *Essex Trades Council, supra,* the court, among other things, said:

"Even when there is a legal remedy, equity will interfere by injunction to prevent (1) an injury which threatens irreparable damage, or (2) a continuing injury when the legal remedy therefor may involve a multiplicity of suits. This jurisdiction is established and unquestionable. In practice, the criterion of its application is the inadequacy of the legal remedy, depending on whether (1) 'the injury done or threatened is of such a nature that, when accomplished, the property cannot be restored to its original condition, or cannot be replaced by means of compensation in money;' (2) whether full compensation for the entire wrong can be obtained without resort to a number of suits. *3 Pom. Eq. Jur.* §§ *1338, 1346, 1357.* The difficulty of satisfactorily estimating damages to business is frequently recognized * * * . *3 Pom. Eq. Jur.* §§ *1352, 1354.*"

To like effect see *Kitty Kelly Shoe Corp.* v. *United Retail, &c., 125 N. J. Eq. 250; 5 Atl. Rep. (2d) 682.*

The complainant is entitled to be protected against threatened irreparable mischief until, at least, he has his day in court, when he may have a full and deliberate investigation. *Evening Times Printing and Publishing Co.* v. *American Newspaper Guild, 124 N. J. Eq. 71; 4 Atl. Rep. (2d) 304.*

The concerted action of the defendants, Russell, Sr., Phyllis Ward and Anna C. Abbott, has all the appearance of a conspiracy to damage the value of the *Newark Star-Ledger* and the property rights of the stockholders, of which the complainant is one, and his rights as an employe. For injury resulting in such circumstance the complainant can obtain no adequate remedy at law. This court is the only tribunal which will afford an adequate remedy.

A case somewhat in point is that of *National Life Insurance Company of the United States* v. *Myers, 140 Illinois Appellate Reports 392,* wherein the court in part said:

"It is further argued that equity has no jurisdiction to enjoin a libel and that the real scope of the bill is to enjoin the publication and circulation of what is claimed to be a libel. Much space is given by appellant's counsel to discussion of the liberty of the press and to decisions in various jurisdictions to the effect that a 'court of chancery will not restrain the publication of a libel because it is a libel.' *Prudential Life Insurance Co.* v. *Knott, 10 L. R. Ch. App. 142.* In the present case it is claimed in behalf of appellee that the injunction in this case does not merely restrain the publication of a libel, as to which there is an adequate remedy at law, but that the fact that the publications complained of are alleged to be libelous is but an incident; that the jurisdiction of equity invoked in the case rests upon other and unquestioned grounds. If a libelous publication is in violation of a valid contract, if it is in pursuance of a wrongful conspiracy to destroy property rights and injure the business of appellee, if the parties issuing the libelous publications are insolvent and no remedy at law exists, if it is inflicting irreparable injury the extent of which cannot be definitely ascertained and for which there is not adequate remedy at law, if the bill shows that not only by publications, but by letters to appellee's agents and employes, appellant is interfering with appellee's business, is seeking to cause policy holders to lapse their policies and to cause its business to be so ruined as to throw it into the hands of a receiver, and all this wrongfully and with malicious purpose, it is difficult to see why equity should withhold its preventive authority."

To the same effect is the decision in *Emack* v. *Kane, 34 Fed Rep. 46,* in which the court in part said:

"I cannot believe that a man is remediless against persistent and continued attacks upon his business, and property rights in his business, such as have been perpetrated by these defendants against the complainant, as shown by the proofs in this case. It shocks my sense of justice to say that a court of equity cannot restrain systematic and methodical outrages

by one man upon another's property rights. If a court of equity cannot restrain an attack like this upon a man's business, then the party is certainly remediless, because an action at law in most cases would do no good, and ruin would be accomplished before an adjudication would be reached. True, it may be said that the injured party has a remedy at law, but that might imply a multiplicity of suits which equity often interposes to relieve from; but the still more cogent reason seems to be that a court of equity can, by its writ of injunction, restrain a wrongdoer, and thus prevent injuries which could not be fully redressed by a verdict and judgment for damages at law. Redress for a mere personal slander or libel may perhaps properly be left to the courts of law, because no falsehood, however gross and malicious, can wholly destroy a man's reputation with those who know him; but statements and charges intended to frighten away a man's customers, and intimidate them from dealing with him, may wholly break up and ruin him financially, with no adequate remedy if a court of equity cannot afford protection by its restraining writ."

The situation here sought to be enjoined is similar.

Expressive of this court's position is the language used in *Mullins* v. *Merchandise Drivers Local Union No. 641, 120 N. J. Eq. 376; 183 Atl. Rep. 485,* which, in part, is as follows:

"The principles I have attempted to express in the instant case are well expressed in *Harriman* v. *Northern Securities Co., 132 Fed. Rep. 464;* because of their obvious application, I am quoting extensively the observations of the court (at *p. 475*) :

" 'The case not being ripe for a final decision, the present application is for a preliminary injunction. The granting or refusal of a preliminary injunction, whether mandatory or preventive, calls for the exercise of a sound judicial discretion in view of all the circumstances of the particular case. Regard should be had to the nature of the controversy, the object for which the injunction is sought, and the comparative hardship or convenience to the respective parties involved in the awarding or denial of the injunction. The legitimate

object of a preliminary injunction, preventive in its nature, is the preservation of the property or rights in controversy until the decision of the case on a full and final hearing upon the merits, or the dismissal of the bill for want of jurisdiction or other sufficient cause. The injunction is merely provisional. It does not, in a legal sense, finally conclude the rights of parties, whatever may be its practical operation under exceptional circumstances. In a doubtful case, where the granting of the injunction would, on the assumption that the defendant ultimately will prevail, cause greater detriment to him than would, on the contrary assumption, be suffered by the complainant through its refusal, the injunction usually should be denied. But where, in a doubtful case, the denial of the injunction would, on the assumption that the complainant ultimately will prevail, result in greater detriment to him than would, on the contrary assumption, be sustained by the defendant through its allowance, the injunction usually should be granted. The balance of convenience or hardship ordinarily is a factor of controlling importance in cases of substantial doubt existing at the time of granting or refusing the preliminary injunction. Such doubt may relate either to the facts or to the law of the case, or to both. It may equally attach to, or widely vary in degree as between, the showing of the complainant and that of the defendant, without necessarily being determinative of the propriety of allowing or denying the injunction. Where, for instance, the effect of the injunction would be disastrous to an established and legitimate business through its destruction or interruption in whole or in part, strong and convincing proof of right on the part of the complainant and of the urgency of his case is necessary to justify an exercise of the injunctive power. Where, however, the sole object for which an injunction is sought, is the preservation of a fund in controversy, or the maintenance of the *status quo*, until the question of right between the parties can be decided on final hearing, the injunction properly may be allowed, although there may be serious doubt of the ultimate success of the complainant. Its allowance in the latter case is a provisional measure, of suspensive effect and in aid of such relief, if any,

as may finally be decreed to the complainant. These views are supported by abundant authority * * *.' "

Viewing all the circumstances, I am satisfied that a balancing of the 'equities definitely calls for immediate relief for complainant by the issuance of a preliminary injunction as prayed for until a final hearing.